# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GARY HAKALA, | Civil Action No. 2:12-cv-1506 |
| Plaintiff, | |
| v. | Magistrate Judge Lisa Pupo Lenihan |
| DR. MIN PARK, M.D., DR. PHILLIP BALK, M.D., R. BILOHLAVEK, R.N., and DARLA COWDEN, M.P.A., | ECF Nos. 115 & 121 |
| Defendants. | |

## MEMORANDUM OPINION[1]

This is a civil rights action that was initiated by Plaintiff *pro se* on October 18, 2012.[2] In his Complaint, Plaintiff alleges that Defendants were deliberately indifferent to his serious medical needs while he was incarcerated at SCI-Fayette between 2009 and 2010. Specifically, he alleges that Defendants intentionally failed to diagnose and treat his lung cancer and related symptoms and also alleges that they falsified his medical records to reflect that he had no medical issues concerning his lungs. All Defendants are or were medical providers who worked at SCI-Fayette during the time period at issue and whom Plaintiff alleges denied and/or failed to

---

[1] In accordance with the provisions of 28 U.S.C. § 636(c)(1), the parties have voluntarily consented to have a United States Magistrate Judge conduct proceedings in this case, including the entry of a final judgment. (ECF Nos. 5, 29, 50.)

[2] On November 30, 2012, the Court granted Plaintiff's Motion for Appointment of Counsel and directed the Clerk to request a lawyer to consider entering an appearance on behalf of Plaintiff. Pro bono counsel accepted the Clerk's request and entered his appearance on February 28, 2013. However, he later withdrew his appearance on August 5, 2014. The Court again directed the Clerk to request a lawyer and new pro bono counsel accepted the request and entered her appearance on July 17, 2015.

diagnose and treat his medical issues.[3]  Now pending before the Court is a Motion for Summary Judgment filed by Defendants Dr. Park, Dr. Bulk and PA Darla Cowden, (ECF No. 115), and a Motion for Summary Judgment filed by Defendant Nurse Bilohlavek, (ECF No. 121).  These Motions will be granted for the following reasons.[4]

A. **Factual Background**

The following facts are undisputed unless otherwise indicated and are taken from the parties' Statements of Material Facts and Responses thereto at ECF Nos. 117/120 & 125, 123 & 126, 127 & 134.[5]

As previously stated, Plaintiff's claims stem from medical issues he experienced while he was incarcerated at SCI-Fayette in 2009 and 2010.[6]  (ECF Nos. 127, 134, 138, at ¶¶ 1-2.)  Plaintiff has a medical history that includes insulin-dependent diabetes mellitus, hepatitis C, and hypertension.  (Id., at ¶ 20.)  For his chronic diseases, Plaintiff was examined at the SCI-Fayette

---

[3] Defendants include Dr. Min Park, Dr. Phillip Balk, and Physician Assistant Darla Cowden and also Nurse Byron Bilohlavek who is represented by separate counsel.

[4] The procedural history of this case is quite lengthy.  Nurse Bilohlavek first moved to dismiss Plaintiff's Complaint for failure to state a claim on February 28, 2013, (ECF No. 15), and that motion was denied by Court Order dated July 3, 2013, (ECF No. 30).  Nurse Bilohlavek then moved for judgment on the pleadings on October 31, 2013, arguing that his motion should be granted because Plaintiff failed to exhaust his administrative remedies prior to filing suit as required by the PLRA.  (ECF No. 39.)  A motion to dismiss was then filed by the remaining medical Defendants on November 22, 2013, who also moved for summary judgment arguing, like Nurse Bilohlavek, that Plaintiff did not exhaust his administrative remedies.  (ECF No. 48.)  Both motions were denied without prejudice by Court Order dated May 29, 2014.  (ECF No. 60.)  Finally, Nurse Bilohlavek moved for summary judgment by motion dated June 4, 2014, arguing once again that Plaintiff did not exhaust his administrative remedies.  (ECF No. 62.)  That motion was denied by Order dated March 6, 2015.  (ECF No. 84.)

[5] Where appropriate, the Court also relies on underlying documentation.

[6] Plaintiff was transferred from SCI-Graterford to SCI-Fayette on December 30, 2008, and he was released from SCI-Fayette and into a half-way house on September 20, 2010.

2

chronic clinic where he saw physicians and had his blood tested at least once every three months. (Id., at ¶¶ 21-22.)

According to Plaintiff, he started to have difficulty breathing, and experienced fatigue and weakness sometime in late March 2010. (ECF No. 127, ¶ 23.) He claims he was not able to exercise and run the track as he had before because he was "breathing all heavy and got light-headed." (Id.) He also claims that he lost 60 pounds of his weight. (Id.)

Plaintiff states that he complained to nurses and doctors about his difficulties in breathing, fatigue and weakness, and that two of these people were PA Darla Cowen and Nurse Byron Bilohlavek, who performed insulin injections for Plaintiff. (Id., at ¶¶ 24, 55, 57-61.) Plaintiff also states that he complained to medical personnel about his symptoms every time he visited the chronic care clinic, and at least once he put in a request for the sick line because of his breathing problems. (ECF No. 125, at ¶ 3.)

Plaintiff claims that he talked to Dr. Park at least twice. (ECF No. 127, at ¶ 42.) He states that one of those times he complained about his respiratory distress and then afterward he received an EKG and a chest x-ray. (Id., at ¶ 44.) He further states that sometime in May or June 2010, he was told by an unidentified doctor that "everything was fine."[7] (Id., at ¶¶ 26, 27.) He was also told that he was fine and had no medical issues concerning his lungs in September

---

[7] In addition to this chest x-ray, Plaintiff also claims that he received a chest x-ray when he was transferred to SCI-Fayette in December 2008. (ECF No. 127, at ¶ 25.) However, Defendants dispute Plaintiff's allegations of both x-rays because there is no record of such x-rays in Plaintiff's DOC medical file or in the records obtained by means of subpoena from the contract x-ray service. (ECF Nos. 134, 138, at ¶ 25; No. 117, at ¶ 21.) They also state it is unlikely that Plaintiff received an x-ray when he was transferred to SCI-Fayette because inmates only receive chest x-rays when entering the DOC and returning to an institution from the streets. (ECF No. 117, at ¶ 12.) According to Plaintiff, however, inmates automatically get a TB test, blood work and a chest x-ray when they are transferred from one institution to another. (ECF No. 125, at ¶ 12.) Therefore, he maintains that there should be an x-ray from December 2009 when he was admitted to SCI-Fayette, as well as the x-ray taken after he saw Dr. Park. (Id.)

3

2010 when they cleared him for release. (ECF No. 125, at ¶ 3.) He states that he was specifically told that he was "healthy as a horse" and "his lungs look good and sound good." (Id.) Plaintiff states that he eventually "started getting agitated" and told them to send him to an outside hospital if they could not help him. (Id., at ¶ 5; ECF No. 127, at ¶¶ 28-29.)

Defendants dispute Plaintiff's allegations of having x-rays taken- see fn. 7- and also dispute Plaintiff's claims regarding his communication with any of the Defendants about his difficulties in breathing and feeling fatigued and weak. Defendants state that while Dr. Park has no recollection of Plaintiff and his treatment, Plaintiff's medical records indicate that Dr. Park only twice examined him, the first time on March 6, 2009, at which time Plaintiff made no complaints of respiratory distress, and his chest was found to have regular respirations and lungs were reported as clear. (ECF No. 117, at ¶¶ 14, 18.) Dr. Park also examined Plaintiff at the chronic care unit on March 9, 2009, where he provided Plaintiff with treatment for his diabetes and hypertension. (ECF No. 117, at ¶ 13.)

Plaintiff's medical records do not indicate any complaints of cough, discharge from the larynx, dyspnea or shortness of breath. (ECF No. 117, at ¶ 11.) In fact, they show that Plaintiff's lungs were checked on August 31, 2009 and the record indicates "lungs clear to auscultation." (ECF No. 117, at ¶ 17.) Defendants also point out that the "Inter-System Transfer Reception Screening" document Plaintiff signed on September 20, 2010, indicates that he denied any acute conditions or problems. (ECF No. 117, at ¶ 10.) However, Plaintiff claims that this was because he could not see the form due to his sight issues as a result of his diabetes and he did not know what the diagnosis was in the release. (ECF No. 125, at ¶ 10.)

As to Dr. Balk, Defendants contend that he never met Plaintiff personally and his only involvement with respect to Plaintiff was to cosign medical records of physician's assistants.

4

(ECF No. 117, at ¶¶ 16, 19.) Plaintiff disputes this and alleges that he met Dr. Balk at least twice, complained to him about his symptoms and asked Dr. Balk to send him to an outside hospital. (ECF No. 125, at ¶ 16.).

After his release from SCI-Fayette on September 20, 2010, Plaintiff saw a primary care physician, Dr. Dolan Wenner, because of complaints of dyspnea on exertion and fatigue. (ECF Nos. 127, 134, 138, at ¶ 30.) He underwent a chest x-ray on October 13, 2010, (id., at ¶ 31), and a CT scan on October 20, 2010, (ECF No. 127-2, at p.1).

On October 27, 2010, he visited Dr. Chinskey at Chest Diseases of Northwestern PA under referral of Dr. Wenner to evaluate a pulmonary nodule. (ECF Nos. 127, 134, 138, at ¶ 32.) Dr. Chinskey's consultation note indicates that Plaintiff's chest x-ray "described an ill-defined left upper lobe lesion" that "felt suspicious for neoplasm." (ECF No. 127-2, at p.1.) It also indicates that his CT scan "confirmed an irregular spiculated lesion in the left upper lobe" that was "noncalcified." (Id.) Of somewhat importance, Dr. Chinskey's consultation note indicates that Plaintiff "had never been told of a previously abnormal x-ray while incarcerated" and that "he had them periodically." (Id.) Dr. Chinskey concluded that "the left upper lobe lesion could be primary lung cancer" but that he was "not sure that explain[ed] [Plaintiff's] exertional dyspnea." (Id., at p.3.)

On November 11, 2010, Plaintiff had a PET/CT scan that indicated a "somewhat nodular and irregular" lesion on his left lung. (ECF No. 127-3, at p.1.) On November 16, 2010, Plaintiff underwent exercise stress testing with perfusion imaging to evaluate hypertension. (ECF No. 127-4, at p.1.)

On November 18, 2010, Plaintiff returned for a follow-up visit with Dr. Chinskey. (ECF No. 127-5, at p.1.) Dr. Chinskey noted that the cause of Plaintiff's dyspnea was "uncertain," and

5

that Plaintiff had "normal pulmonary function" and "no obvious cardiac disease." (Id.) Dr. Chinskey also noted that malignancy of Plaintiff's left upper lobe nodule could not be excluded and after discussion Plaintiff indicated that he wanted a tissue diagnoses. (Id.) Dr. Chinskey proposed a navigational bronchoscopy and a specific CT, and Plaintiff agreed to proceed with the proposed procedure. (Id.)

After the navigational bronchoscopy, Plaintiff returned to see Dr. Chinskey on December 16, 2010. (ECF No. 127-6, at p.1.) He was diagnosed with "nonsmall cell cancer in his left upper lobe," and he agreed to proceed with "surgical and other intervention." (Id.)

On December 22, 2010, Dr. Jan M. Rothman confirmed that Plaintiff had "what appear[ed] to be early stage lung cancer" and recommended lobectomy/node dissection. (ECF No. 127-7, at pp.1-2.) Also on this day, Dr. Walter E. Rizzoni recommended that Plaintiff undergo "intraoperative fiberoptic bronchoscopy, left upper lobectomy and mediastinal node dissection." (ECF No. 127-8, at pp.1-2.) Dr. Rizzoni performed the recommended surgical procedure on Plaintiff on January 5, 2011. (ECF No. 127-9, at pp.1-3.)

**B. Exhaustion of Administrative Remedies**

Defendants move for summary judgment on the basis that Plaintiff did not exhaust his administrative remedies prior to filing this lawsuit. In this regard, the Prison Litigation Reform Act ("PLRA"), Pub. L. No. 104-134, 110 Stat. 1321 (1996), Congress amended 42 U.S.C. § 1997e(a), prohibits prisoners from bringing an action with respect to prison conditions pursuant to 42 U.S.C. § 1983 or any other federal law, until such administrative remedies as are available are exhausted. Specifically, the act provides in pertinent part as follows:

> No action shall be brought with respect to prison conditions under section 1979 of the Revised Statutes of the United States (42 U.S.C. § 1983), or any other Federal law, by a prisoner confined in any jail, prison, or other correctional facility until such administrative remedies as are available are exhausted.

6

42 U.S.C. § 1997e(a). Exhaustion is required under this provision regardless of the type of relief sought and the type of relief available through administrative procedures. *See* Booth v. Churner, 532 U.S. 731, 741 (2001). In addition, the exhaustion requirement applies to all claims relating to prison life which do not implicate the duration of the prisoner's sentence, including those that involve general circumstances as well as particular episodes.[8] *See* Porter v. Nussle, 524 U.S. 516, 532 (2002).

One of the primary purposes of the PLRA's mandatory exhaustion requirement is to "afford[] corrections officials time and opportunity to address complaints internally before allowing the initiation of a federal case. In some instances, corrective action taken in response to an inmate's grievance might improve prison administration and satisfy the inmate, thereby obviating the need for litigation." Porter, 534 U.S. at 525 (citing Booth, 532 U.S. at 737). "And for cases ultimately brought to court, adjudication could be facilitated by an administrative record that clarifies the contours of the controversy." Id.

### C. Discussion

---

[8] Within DC-ADM 804, the Inmate Grievance System Policy, the Pennsylvania Department of Corrections established a three-step Inmate Grievance System to provide inmates with an avenue to seek review of problems that may arise during the course of confinement. Pursuant to DC-ADM 804, after an attempt to resolve any problems informally, an inmate may submit a written grievance to the facility's Grievance Coordinator for initial review. This must occur within fifteen days after the events upon which the claims are based. Within fifteen days of an adverse decision by the Grievance Coordinator, an inmate may then appeal to the Facility Manager of the institution. Within fifteen days of an adverse decision by the Facility Manager, an inmate may file a final appeal to the Secretary's Office of Inmate Grievances and Appeals ("SOIGA"). An appeal to final review cannot be completed unless an inmate complies with all established procedures. An inmate must exhaust all three levels of review and comply with all procedural requirements of the grievance review process in order to fully exhaust an issue. *See* Booth v. Churner, 206 F.3d 289, 293 n.2 (3d Cir. 2000) (outlining Pennsylvania's grievance review process); Ingram v. SCI Camp Hill, No. 08-23, 2010 U.S. Dist. LEXIS 127124, at *21-25 (M.D. Pa. Dec. 1, 2010) (same).

As discussed in Footnote 4 of this Opinion, Defendants have previously argued for the dismissal of Plaintiff's claims based on his failure to exhaust his administrative remedies. The first time this issue was addressed by the Court, it was denied without prejudice to raise again on summary judgment.[9] (ECF No. 60.) The second time it was addressed, it was once again denied and the Court stated that Plaintiff could proceed with his claims because he "was unable to exhaust his administrative remedies through no fault of his own."[10] (ECF No. 84 at p.7.) Defendants again argue that Plaintiff's claims are barred because he did not exhaust his administrative remedies, and this time, the Court agrees that Plaintiff's failure to exhaust is fatal to his claims.[11]

---

[9] This case was complicated by the fact that Plaintiff was not a prisoner at the time he discovered he had cancer, but he was a prisoner at the time he filed this lawsuit (Plaintiff was reincarcerated in July 2011 after violating his parole). As such, the Court had to initially address whether Plaintiff was even subject to the PLRA's exhaustion requirement since litigants who file lawsuits after their release from incarceration are not subject to the requirement for incidents concerning prison conditions which occurred prior to their release. (ECF No. 60, at p.3.) Acknowledging that courts who have addressed this issue have strictly interpreted the PLRA statute, 28 U.S.C. § 1997e(a), to put the operative question on the status of the plaintiff when the action was *brought*, not when the alleged violations *occurred*, this Court found in its May 29, 2014 Opinion on Defendants' Motions to Dismiss and for Judgment on the Pleadings, that Plaintiff was indeed a prisoner subject to the PLRA requirements including the requirement to exhaust his administrative remedies prior to filing his lawsuit. However, this Court stated that Plaintiff was "only required to exhaust those facts relating to Defendants' misconduct in connection with his medical care, or lack thereof[,]" not the fact that Defendants' failed to treat his cancer specifically. (ECF No. 60, at p.6.)

[10] In finding that he was unable to exhaust through no fault of his own, this Court relied on Plaintiff's assertion that he had no reason to file a grievance when he was at SCI-Fayette because he was told by the medical staff that he had no medical issues concerning his lungs. (ECF No. 84, at p.7.) Also, when he later discovered he had cancer, and then was incarcerated again in July 2011 for a parole violation, the time to file a grievance had long since passed. Id. This finding, however, was made on a limited record and before any discovery had taken place. *See* FN 9.

[11] Although Plaintiff does not argue that, given the statements made in this Court's prior decision, the law-of-the-case doctrine should prevent this Court from finding that Plaintiff was required to exhaust his administrative remedies, it is noted that a court may depart from the law of the case if proper circumstances present themselves, such as when new evidence becomes available or a

It is undisputed that while he was at SCI-Fayette Plaintiff did not file a grievance concerning the medical care that is the subject of his Complaint, and, therefore, he did not exhaust his administrative remedies as required by the PLRA. However, Plaintiff argues that his failure to exhaust his administrative remedies should not bar his claims because (1) he had no need for administrative intervention of the grievance system to express his medical concerns, (2) until discovery of his lung cancer, he had no "good cause" for grievances, and (3) he was not a "prisoner" when he filed his Complaint because his claim is based upon knowledge that he learned while outside of prison. (ECF No. 128, at pp. 8-9.) For the following reasons, none of these arguments relieve Plaintiff from having to comply with the PLRA's exhaustion requirement.[12]

In the first of his arguments, Plaintiff states that the prison grievance system is a way for inmates to express their concerns, and he had no reason to file a grievance because he had everyday access to the medical staff whereby he could express his medical concerns without the need for administrative intervention. Essentially, this argument implies that the filing of a grievance would have been futile. However, as discussed in the next section, as of the spring and

---

factual record is expanded via discovery. *See* Curran v. Kwon, 153 F.3d 481, 487 n. 11 (7th Cir.1998) (citing Moore's Federal Practice § 56.10[7] (3d ed.1998) (stating that, although a denial of summary judgment is generally treated as law of the case, a subsequent summary judgment motion may be considered if it raises different issues, different grounds, additional facts or precedent)). When the Court last addressed the issue of exhaustion, it was ruling on a limited record because the parties had not yet engaged in discovery. Now that the factual record has expanded, the additional evidence before the Court, including, most importantly, Plaintiff's own deposition, leads the Court to revisit its prior denial of summary judgment regarding Plaintiff's failure to exhaust and find otherwise.

[12] The Third Circuit has excused the failure to exhaust in limited circumstances when the grievance procedure is unavailable to the prisoner. *See, e.g.*, Brown v. Croak, 312 F.3d 109, 113 (3d Cir. 2002) (prison officials' instruction that plaintiff must delay filing grievance would render the grievance procedure unavailable); Camp v. Brennan, 219 F.3d 279, 280-81 (3d Cir. 2000) (correctional officers impending plaintiff's ability to file a grievance renders grievance procedure unavailable).

summer of 2010, Plaintiff was clearly dissatisfied with the way medical staff were addressing, or not addressing his medical concerns, even going so far as to request that he be sent to an outside hospital. As such, even if he had everyday access to medical staff to whom he expressed his concerns, it would not have been futile for him to complain about his medical care in a grievance so as to put the DOC on notice that he believed his medical concerns were not being adequately addressed. Such action would have given the DOC an opportunity to review Plaintiff's medical care and take corrective action if necessary. Moreover, the Third Circuit Court of Appeals has specifically rejected the futility argument subscribed to by other courts of appeal, and has held that the PLRA makes exhaustion of all administrative remedies mandatory. Nyhuis v. Reno, 204 F.3d 65, 67 (3d Cir. 2000). As stated by the Third Circuit, "it is beyond the power of the court – or any other – to excuse compliance with the exhaustion requirement, whether on the ground of futility, inadequacy or any other basis." Id. at 73. (quotation omitted). While Plaintiff may think that he did not need to file a grievance because he had everyday access to the medical staff to which he could address his concerns directly, according to Congress, he did. Therefore, this argument does not save Plaintiff's claims, even if, as explained in the next paragraph, he believed he had no reason to file a grievance because of medical's assurances that nothing was wrong with his lungs.

In the second of Plaintiff's arguments, which is much related to the first, Plaintiff states that he had no "good cause" to file a grievance because he complained to the medical staff directly and they assured him that he had no cause to worry. While Plaintiff may try to paint a picture that it was not until after he was released from prison and discovered that he had lung cancer that he had "good cause" to complain about what did or did not occur at SCI-Fayette, his deposition testimony paints a much different picture, one that reveals he was clearly dissatisfied

10

with the treatment, or lack thereof, that he was receiving while he was there. Specifically, Plaintiff testified as follows:

> Q: Would you agree with me that you weren't happy with the treatment at Fayette you were getting in May, June, July and August of 2010 at Fayette?
>
> A: Excuse me?
>
> Q: You were complaining about being weak and feeling something in your lungs in the spring and summer of 2010; right?
>
> A: Yes.
>
> Q: And you weren't happy with the treatment you were getting there in the spring and summer of 2010; correct?
>
> A: Yes.
>
> Q: Did you file a grievance over that?
>
> A: No.
>
> Q: Is there a reason why?
>
> A: No. They're medical staff. I believe in them. So I would talk to them verbally.

(ECF No. 131, at pp.34-35.) When asked whether he believed the medical staff when they told him he was fine, he said no and that he thought they were just "blowing smoke up [his] ass." Id., at 86. He even testified that he "started getting agitated" when he would complain and nothing would happen, and on several occasions he requested to be sent to an outside hospital for a second opinion if the medical staff at SCI-Fayette was unable to determine what was wrong with him. (Id. at pp.20, 26, 31, 32, 34, 43, 77, 86.) This clearly demonstrates that Plaintiff believed his health problems were not being adequately treated while he was at SCI-Fayette, and whether or not medical staff assured him that there was nothing to worry about, he should have nevertheless filed a grievance to record his complaints and completed the administrative review

process that was available to him at that time. Accordingly, this second argument does not save Plaintiff's claims either as he cannot rely on the medical staff's assurances that he was "okay" as having no "good cause" to file a grievance.

Finally, in the last of Plaintiff's arguments, he states that because his claim is based on knowledge that he learned while outside of prison, *i.e.*, that he had lung cancer, he cannot be considered a "prisoner" who is subject to the strictures of the PLRA. The Court has already addressed this issue in a prior Opinion, *see* fn. 9, and it sees no reason to depart from its finding that Plaintiff was indeed a "prisoner" at the time he "brought" his Complaint in this action, which is the standard that governs under the PLRA, not when the alleged violations occurred. Nevertheless, the alleged violations in this case did occur while Plaintiff was a prisoner at SCI-Fayette. Plaintiff's claims are that Defendants were deliberately indifferent to his medical needs and concerns, which may or may not have stemmed from his lung cancer,[13] and that they deliberately falsified his medical records to cover up the fact that they knew he had cancer. Even if Plaintiff states his claim as Defendants being deliberately indifferent to his medical needs by failing to diagnose his lung cancer, that is still an alleged violation that occurred while he was a prisoner at SCI-Fayette. Simply put, when Plaintiff learned he had cancer is irrelevant to whether or not his claims are barred for his failure to exhaust. Therefore, Plaintiff cannot escape the PLRA's exhaustion requirement, with which he admittedly did not comply.

---

[13] In fact, one of Plaintiff's outside doctors was unsure whether Plaintiff's breathing problems were even caused by what was eventually diagnosed as lung cancer. *See* ECF No. 127-2, at p.3, New Consultation Note for Gary Hakala by Dr. Chinskey, Oct. 27, 2010 ("Concern raised that the left upper lobe lesion could be primary lung cancer. I am not sure that explains his exertional dyspnea."); ECF No. 127-5, at p.1, Evaluation of Gary Hakala by Dr. Chinskey, Nov. 18, 2010 ("The cause of his dyspnea is uncertain. Normal pulmonary function, no obvious cardiac disease, would monitor for now.")

### D. Conclusion

For the reasons stated herein, Defendants' Motions for Summary Judgment (ECF Nos. 115 & 121) will be granted for Plaintiff's failure to exhaust his administrative remedies prior to filing this lawsuit as required by the PLRA.[14]  A separate Order will issue.

Dated: March 29, 2017

_____
Lisa Pupo Lenihan
United States Magistrate Judge

cc: Counsel of Record
 *Via ECF Electronic Mail*

---

[14] Defendants also move for summary judgment on Plaintiff's claims of deliberate indifference but the Court expresses no opinion as to the merits of their arguments.

# IN THE UNITED STATES DISTRICT COURT
# FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| GARY HALAKA, ) | |
| ) | Civil Action No. 2:12-cv-1506 |
| Plaintiff, ) | |
| ) | |
| v. ) | Magistrate Judge Lisa Pupo Lenihan |
| ) | |
| DR. MIN PARK, M.D., DR. PHILLIP ) | |
| BALK, M.D., R. BILOHLAVEK, ) | ECF Nos. 115 & 121 |
| R.N., and DARLA COWDEN, ) | |
| M.P.A., ) | |
| ) | |
| Defendants. ) | |

**AND NOW**, this 29th day of March 2017, after the Plaintiff, Gary Halaka, filed an action in the above-captioned case, and after Defendants filed Motions for Summary Judgment,

**IT IS HEREBY ORDERED** that for the reasons set forth in this Court's Opinion filed contemporaneously herewith, Defendants' Motions for Summary Judgment (ECF No. 115 &121) are **GRANTED**.

**IT IS FURTHER ORDERED** that the Clerk of Court mark this case closed.

**AND IT IS FURTHER ORDERED** that, pursuant to Rule 4(a)(1) of the Federal Rules of Appellate Procedure, if Plaintiff wishes to appeal from this Order a notice of appeal, as provided in Fed. R. App. P. 3, must be filed with the Clerk of Court, United States District Court, at 700 Grant Street, Room 3110, Pittsburgh, PA 15219, within thirty (30) days.

_____
Lisa Pupo Lenihan
United States Magistrate Judge

cc: Counsel of record
*Via CM/ECF electronic mail*